# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **Gary Hobbs,** | * | |
| **Plaintiff,** | * | |
| v. | * | **CIVIL NO. JKB-16-0749** |
| **Sean St. Martin,** | * | |
| **Defendant.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Gary Hobbs ("Plaintiff") brought an action against Sean St. Martin ("Defendant") for Money Had and Received (Count I) and Unjust Enrichment (Count II). (Am. Compl., ECF No. 29.) Now pending before the Court is Defendant's Motion for Summary Judgment. (ECF No. 48.) The Motion has been briefed (ECF Nos. 48-1, 51, and 55) and no hearing is required, *see* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, Defendant's Motion will be DENIED.

## *I. Background*

This case revolves around the conduct of an individual named Richard Hagen, a nonparty. Mr. Hagen operated a Ponzi scheme for years: He solicited money from individuals to "invest" in various endeavors and then used the money to support an extravagant lifestyle and pay off other "investors." Both Plaintiff and Defendant invested money with Mr. Hagen over the years. Although they both received returns on some of their investments, they now generally agree that Mr. Hagen likely never used any of their money for legitimate purposes. Unfortunately for Plaintiff, he was left holding the short straw when Mr. Hagen failed to pay back a $500,000 loan

from Plaintiff that Mr. Hagen used to pay off a debt he owed to Defendant's company, Stag Mountain LLC. Mr. Hagen subsequently committed suicide.

Plaintiff met Mr. Hagen in 2002 or 2003 when they were working together at a company called Unisys. (Hobbs Dep., ECF No. 48-2, at 233.) Beginning in 2003, Mr. Hagen started soliciting funds from Plaintiff, purportedly to invest in various companies and endeavors. Plaintiff first gave Mr. Hagen $20,000 to $50,000 to invest in a grocery store. (*Id.* at 38–43.) A short time later, Mr. Hagen informed Plaintiff that he could get a better return on his investment by putting it towards an operation that involved purchasing land in New Jersey to build "cell towers" on and then leasing the land to the state "for highway maintenance stuff." (*Id.* at 39.) Plaintiff contributed another $40,000 to the purported cell tower land project, and Mr. Hagen also rolled over Plaintiff's original investment into this new venture. (*Id.* at 41.) Plaintiff did not receive any documentation from Mr. Hagen regarding either of these "investments." (*Id.* at 47–49.)

Mr. Hagen subsequently approached Plaintiff about investing money in a fund that was set up to contribute to a "classified operation" that was similar to "AirAmerica." (*Id.* at 50.) Plaintiff's original investment was purportedly rolled over into this fund. (*Id.*) Plaintiff also contributed significantly more money to the fund in three tranches, ultimately bringing his total investment in the fund to approximately $495,000. (*Id.*) Mr. Hagen told Plaintiff that he would receive regular interest payments from the fund and would eventually receive a payout of $3 million in anywhere from four to seven years. (*Id.* at 52.) From June 2010 through May 2014, Plaintiff received a monthly check from Mr. Hagen in the amount of $5,500, which was purported to be an interest payment on his investment in the fund. (*Id.*) Because the fund was

investing in a classified operation, Plaintiff never received nor asked for any documentation that would verify its operations (or even its existence). (*Id.* at 61–62.)

Defendant and Mr. Hagen first met in 2008 through a mutual acquaintance named Bill Cowan. Mr. Hagen approached Mr. Cowan and Defendant with a purported investment opportunity involving a contract to supply services to the Department of Homeland Security ("DHS") for a survey project at airports, ports, and other facilities. (Answers to Interrogs., ECF No. 51-4, at 13.) Mr. Hagen and Mr. Cowan formed a joint venture called Tamarack Systems, which they used to facilitate their investments in the purported DHS contract. (*Id.*) Tamarack invested $1,478,471.71 in the DHS project through Mr. Hagen and received $2,023,322.71 in return between October 2008 and September 2011. (Tamarack Ledger, ECF No. 51-9.) Defendant and Mr. Cowan never received any documentation from Mr. Hagen about the DHS contract due to the purportedly sensitive and secure nature of the work. (ECF No. 51-4, at 13.)

In 2012, Mr. Hagen acquired a ten percent stake in Stag Mountain, LLC, ("Stag") a government contractor in the security field. Defendant is the managing (and only other) member of Stag. According to Defendant, Mr. Hagen "did not participate in the business of the company" and "was not an employee." (ECF No. 51-4, at 14.) However, Mr. Hagen told Plaintiff that he was the Chief Executive Officer of Stag Mountain and gave him a business card indicating as much. (Hobbs Decl., ECF No. 51-27, ¶ 24.) The record indicates that Mr. Hagen made two contributions to Stag in October 2012, a wire in the amount of $200,000 and a check for $25,000. (ECF No. 51-20.) It is not clear how this money was used. Mr. Hagen's tax records indicate that he had a negative capital account with Stag for 2014 and 2015. (Hagen K-1s, ECF No. 51-21.)

In February 2014, Mr. Hagen solicited a $500,000 "investment" from an individual named Bret Anderson. This investment triggered a cascading series of events ending with the instant lawsuit. Mr. Hagen told Mr. Anderson that his money would be invested in a company called In-Q-Tel, which Mr. Hagen described as a private arm of the CIA. (Anderson Dep., ECF No. 48-3, at 8.) Due to the nature of In-Q-Tel's work with the CIA, Mr. Anderson did not receive any documentation regarding his investment. (*Id.* at 20.) Mr. Anderson's investment was for a forty-five day term with the opportunity to reinvest at the end of that time period. (*Id.* at 12–13.) However, Mr. Anderson became nervous about his "strong leap of faith" and told Mr. Hagen he wanted to cash out at the end of the first forty-five day period. (*Id.* at 18.)

In order to pay Mr. Anderson back, Mr. Hagen asked Defendant for a short term loan. Defendant told Mr. Hagen that Stag would provide a $500,000 loan on the condition that the recipient or Mr. Hagen pay it back within ten days. (St. Martin Dep., ECF No. 51-2, at 163.) Mr. Hagen and Defendant (on behalf of Stag) then executed a "demand note" laying out those terms. (Note, dated May 15, 2014, ECF No. 51-24.) Defendant subsequently authorized a $500,000 wire transfer directly from Stag's bank account to Mr. Anderson's bank account. Defendant did not ask who Mr. Anderson was nor did he ask Mr. Hagen why he needed the money. (St. Martin Aff., ECF No. 51-6, ¶ 5.) Mr. Hagen did not repay the funds by May 25, 2014, as promised. (*Id.*, ¶ 6.)

In early June 2014, Mr. Hagen approached Plaintiff and requested a loan of $500,000. (ECF No. 51-27, ¶ 8.) Mr. Hagen claimed that the money would be used to buy out an investor in the purported fund that Plaintiff had already sunk roughly $495,000 into. (*Id.*, ¶ 9.) Mr. Hagen led Plaintiff to believe that once the investor was bought out he would receive the substantial multi-million dollar return from the fund he had been promised. (*Id.*) Of course, it

now seems clear that there was no fund and Mr. Hagen simply needed the money to repay Stag. Mr. Hagen instructed Plaintiff to wire the money to Defendant, and Plaintiff then instructed his broker to wire $500,000 from his Individual Retirement Account ("IRA") directly to Defendant's bank account.[1]  (ECF Nos. 48-6, 48-7, 48-8.)

Upon receiving the money, Defendant retained $289,000 in his personal bank account. (St. Martin. Supp. Aff., ECF No. 48-10, ¶ 7.) Defendant claims that Stag owed him this money for loans he had made to Stag over the prior sixteen months. (*Id.*) Defendant transferred an additional $70,000 to Affiliations Group, another entity owned by Defendant that Stag allegedly owed money for past loans. (*Id.*, ¶ 8.) Finally, Defendant transferred the remaining $141,000 to Stag. (*Id.*)

## II.   *Standard for Summary Judgment*

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To

---

[1]   It appears undisputed at this point that Plaintiff personally authorized the wire transfer to Defendant despite the fact that Plaintiff alleged otherwise in his Amended Complaint and the declaration attached to his opposition to the instant Motion. As explained *infra*, the fact that Plaintiff personally authorized the transfer at issue is not legally relevant. Moreover, Plaintiff seems to concede in his opposition brief that he authorized the transfer. While the apparent inaccuracies in Plaintiff's declaration have no legal impact on the current motion, the Court is troubled by Plaintiff's failure to amend his declaration (which was signed nearly two years ago) to ensure its accuracy before filing it with his opposition motion.

carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III. Analysis

As this Court has previously stated, Plaintiff's claims for unjust enrichment and money had and received are subject to a common analysis: "To recover under either theory, the plaintiff must demonstrate that the defendant received a benefit which equity requires the defendant to relinquish." (Mem. Op. on Mot. to Dismiss, ECF No. 18, at 4–5 (citing *Jennings v. Rapid Response Delivery, Inc.*, Civ. No. WDQ-11-0092, 2011 WL 2470483, at *6 (D. Md. June 16, 2011)).) Specifically, a claim for unjust enrichment requires the plaintiff to establish three elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of or appreciated the benefit; and (3) the defendant accepted or retained the benefit under such circumstances that it would be inequitable to allow the defendant to retain the benefit without paying value in return. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007). There is no dispute that Plaintiff conferred a benefit upon Defendant and that Defendant knew of or appreciated the benefit. Thus, the only issue is whether it would be inequitable for Defendant to retain the benefit conferred on him by Plaintiff. *See Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 576 (Md. Ct. Spec. App. 2007) ("[W]hile a person is enriched if he has received a benefit, the law does not consider him *unjustly* enriched unless the circumstances of the receipt of the benefit are such as between the two that to retain it would be unjust." (alteration in original)

6

(emphasis added) (internal quotations omitted) (quoting *First Nat'l Bank v. Shpritz*, 493 A.2d 410, 419 (Md. Ct. Spec. App. 1985))).

Defendant has moved for summary judgment on one, and only one, ground: He contends that Plaintiff is not entitled to restitution because he "voluntarily and personally authorized $500,000.00 to be transferred from his investment account to Defendant." (Mem in Supp. of Def.'s Mot. for Summ. J., ECF No. 48-1, at 1.) In other words, Plaintiff was a "voluntary payor" and cannot seek restitution from Defendant for money Plaintiff foisted on him. Plaintiff counters that he is not a voluntary payor, and therefore is entitled to restitution unless Defendant was a bona fide purchaser. Plaintiff argues that he is not a voluntary payor because he only transferred money to Defendant as a result of Mr. Hagen's fraud. Plaintiff also argues that Defendant was not a bona fide purchaser because (1) he was aware (or at least should have been aware) of Mr. Hagen's fraud in procuring the $500,000 transfer from Plaintiff to Defendant, and (2) he failed to give valuable consideration for the $500,000. For the reasons set forth below, the Court concludes that Defendant is not entitled to judgment as a matter of law. Accordingly, his Motion will be DENIED.

### A. *Plaintiff Is Not A Voluntary Payor or Officious Intermeddler*

Generally, "[a] person who receives a benefit by reason of an infringement of another person's interest . . . owes restitution to him in the manner and amount necessary to prevent unjust enrichment." *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000) (quoting Restatement (Second) of Restitution § 1 (Tentative Draft No. 1, 1983)). However, a person "is not *unjustly* enriched, and therefore not required to make restitution where the benefit was conferred by a volunteer or intermeddler." *Hill*, 936 A.2d at 352 (emphasis added) (quoting *Dan B. Dobbs*, Handbook on the Law of Remedies § 4.9 (1973)). The principle behind this rule is

7

that one should not be allowed to unilaterally insert himself into the affairs of another, for example, by paying the other's debt, and then demand restitution. *Id.*; *see* Restatement (First) of Restitution § 2 cmt. (Am. Law Inst. 1937) (hereinafter "Restatement") ("Officiousness means interference in the affairs of others not justified by the circumstances under which the interference takes place."). A volunteer (also sometimes called an officious intermeddler) is "[a] person who *without mistake, coercion or request* has unconditionally conferred a benefit upon another." Restatement § 112 (emphasis added); *accord Diane Sales, Inc. v. Am. Express Centurion Bank*, No. CV GLR-14-1063, 2015 WL 10986308, at *3 (D. Md. Oct. 26, 2015). On the other hand, "a plaintiff is not officious when he . . . acts under a legal compulsion or duty, . . . acts to protect his or her own property interests, . . . or acts pursuant to a reasonable or justifiable mistake as to any of the aforementioned categories." *Hill*, 936 A.2d at 358.

Defendant argues that Plaintiff is a voluntary payor, and therefore not entitled to restitution, because Plaintiff personally authorized the wire transfer to Defendant. In fact, Defendant is so sure that this argument is a slam dunk he has filed a separate motion seeking sanctions against Plaintiff for filing a frivolous lawsuit. (ECF No. 56.) Defendant misunderstands the meaning of a voluntary payor. The fact that Plaintiff knew he was wiring $500,000 to Defendant does not mean that he intended to voluntarily, officiously, and unconditionally confer a benefit on Defendant. Indeed, Defendant himself repeatedly insists that he had no idea who Plaintiff was prior to the filing of this lawsuit. It would be odd, to say the least, for Plaintiff to unconditionally confer such a significant financial benefit on someone he does not know.

More importantly, however, Plaintiff cannot be a voluntary payor if he conferred a benefit on Defendant by mistake (i.e., fraud). Restatement § 112 cmt. (explaining that "a person is entitled to restitution for a benefit conferred as the result of mistake including fraud"). This rule

applies with equal force whether the fraud is committed by the beneficiary (in this case, Defendant) or a third party (i.e., Mr. Hagen). Restatement § 17 cmt. ("[A] donee beneficiary who has acquired a benefit by the fraud of the third person, has the same duties of restitution as the third person would have had . . . ."). In arguing that Plaintiff is a voluntary payor, Defendant simply ignores the underlying fraud by Mr. Hagen that prompted Plaintiff to transfer $500,000 to Defendant.[2]

For support, Defendant points to a number of cases in which courts have found that a third party beneficiary was not unjustly enriched. (ECF No. 48-1, at 18–19 (citing *Diane Sales*, 2015 WL 10986308, at *3; *Bennett Heating & Air Conditioning, Inc. v. Nations Bank of Md.*, 674 A.2d 534 (Md. 1996); *Francis O. Day Co., Inc. v. Montgomery Cty*, 650 A.2d 303 (Md. Ct. Spec. App. 1994); *Meehan v. Cheltenham Twp.*, 189 A.2d 593 (Pa. 1963).) These cases are factually distinguishable and not persuasive.

Defendant relies most heavily on *Diane Sales*, in which the defendant, American Express ("AMEX"), had debited thousands of dollars from the plaintiff's bank account for payment towards the plaintiff's *son's* credit card debt. The court denied AMEX's motion for summary judgment on the plaintiff's unjust enrichment claim because the parties disputed whether the plaintiff had authorized the payments or the son had *fraudulently* authorized them. *Diane Sales*, 2015 WL 10986308, at *3. The court stated that the plaintiff would be a volunteer, and thus not entitled to restitution, "[i]f [it] authorized the payments." *Id*. In other words, the court was faced with a binary outcome: If the plaintiff authorized the payments, then the son did not, and hence

---

[2] To the extent that Defendant disputes that Mr. Hagen fraudulently induced Plaintiff to make the payment at issue, something he has not made clear in his papers, he still is not entitled to summary judgment. Assuming that issue is even in dispute, it depends in large part on the credibility of Plaintiff and therefore is not the proper subject of a motion for summary judgment. *See, e.g.*, *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015) ("In considering a motion for summary judgment, the district court . . . . cannot weigh the evidence or make credibility determinations.")

they were not conferred to the defendant as a result of fraud. But those are not the facts here. Rather, it is undisputed that Plaintiff conferred the money at issue to Defendant as a result of Mr. Hagen's fraud—i.e., the payment was not "authorized" by Plaintiff because it was fraudulently induced.

The other cases cited by Defendant are no more helpful to his argument. Each of those cases involved an unjust enrichment claim brought by a subcontractor against an owner after the contractor had defaulted on its obligations to the plaintiff-subcontractor. Putting aside the unique nature of the subcontractor-contractor-owner relationship, which makes these cases of little value to the instant dispute, none of the claims were based on the fraudulent conduct of a third party. On the contrary, these cases all rely on the basic principle found in Section 110 of the Restatement, which provides that "[a] person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other *merely because of the failure of performance by the third person*." Restatement § 110 (emphasis added); *see, e.g.*, *Meehan*, 189 A.2d at 596 (citing § 110 of the Restatement). But Plaintiff is not seeking restitution from Defendant merely because Mr. Hagen failed to perform; he is seeking restitution because Mr. Hagen fraudulently induced him to convey $500,000 to Defendant. Defendant does not dispute this. Accordingly, Defendant is not entitled to summary judgment on the ground that Plaintiff is a voluntary payor.

### B. *Defendant Is Not A Bona Fide Purchaser*

Assuming Plaintiff can establish that he transferred money to Defendant due to Mr. Hagen's fraud, he is still not entitled to restitution from Defendant if Defendant gave valuable consideration for the money without notice (actual or constructive) of the fraud. Restatement § 13 ("A person who has entered into a transaction with another under such circumstances that,

because of a mistake, he would be entitled to restitution from the other . . . is not entitled to restitution from a third person who . . . has given value therefor without notice of the circumstances . . . ."). Indeed, even if Defendant never had actual or constructive notice of Mr. Hagen's fraud, he may be unjustly enriched such that restitution is required if he did not give any value for the benefit he received. Restatement § 123 (explaining that a person who innocently acquires property may still be required to return it when "he is not a purchaser for value"). To find otherwise would result in a potential windfall for Defendant at Plaintiff's expense.

In his Motion, Defendant includes one sentence that, very generously construed, could be viewed as an assertion that he gave valuable consideration for the $500,000 he received from Plaintiff. Defendant simply states the following: "Regarding the so-called 'consideration' theory, Plaintiff has not offered any expert evidence contesting in any way the evidence placed into the Record by Defendant."[3] (ECF No. 48-1, at 20.) This argument lacks sufficient clarity and support to warrant consideration by the Court. *See* Fed. R. Civ. P. 56(c)(1)(A) (stating that party must support its assertions by citing specific evidence from record). That said, the Court notes that the record is devoid of any evidence that Defendant gave any value for the money he received from Plaintiff. As the Court previously noted, it was *Stag*, not Defendant, who made the loan to Mr. Hagen.

Moreover, Defendant's financial records regarding personal loans he made to Stag are not relevant. (*See* ECF No. 51-28.) As an initial matter, the accuracy of these records, which were assembled by Defendant after the fact and solely for purposes of this litigation, is in dispute. (ECF No. 51, at 33–34 (identifying alleged discrepancies in Defendant's accounting records).)

---

[3] In briefly addressing what he dubs the "so called 'consideration' theory," Defendant appears to be referencing the Court's previous Memorandum (ECF No. 27), which explained that Plaintiff could pursue one of two potential theories of inequity in seeking restitution from Defendant: (1) a "bad faith" theory, and (2) a "lack of consideration" theory.

11

But, even assuming the records are accurate, the alleged loans by Defendant to Stag spanning a number of years are far too removed from the transaction at issue here between Plaintiff and Defendant to constitute valuable consideration for the benefit conferred upon Defendant by Plaintiff. *Plitt v. Greenberg*, 219 A.2d 237, 244 (Md. 1966) (explaining, in suit for unjust enrichment, that "an exchange of monies in a wholly distinct transaction" does not qualify as consideration).

### *C. Defendant's Alleged Bad Faith*

The Court need not and therefore will not make a finding regarding Defendant's notice of Mr. Hagen's fraud (i.e., his alleged bad faith). Defendant has adamantly denied that he was aware that Mr. Hagen was operating a Ponzi scheme. That said, the Court notes that even if Defendant did not have *actual* notice of Mr. Hagen's conduct, it may still be unjust for him to retain the funds he received from Plaintiff. Absent special circumstances, it would be inequitable for Defendant to retain the funds if he had constructive notice of Mr. Hagen's fraud—that is, "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry." *Fertitta v. Bay Shore Dev. Corp.*, 291 A.2d 662, 669 (Md. 1972); *accord Howard Chertkof & Co. v. Gimbel*, 849 A.2d 1036, 1049 (Md. Ct. Spec. App. 2004). "The standard for determining what facts suffice to 'excite inquiry' is 'notice of facts which would lead an ordinarily prudent [person] to make an examination.'" *Beins v. Oden*, 843 A.2d 147, 152 (Md. Ct. Spec. App. 2004) (quoting *Williams v. Skyline Dev. Corp.*, 288 A.2d 333, 353 (Md. 1972)). Plaintiff has alleged various facts—not least of which is the fact that Defendant approved a $500,000 transfer by Stag to an individual he did not know and subsequently received a $500,000 transfer from a *different* individual he did not know—which arguably would have triggered an ordinarily prudent person to ask some basic questions. Assuming such a duty to

12

inquire was triggered, Defendant would rightly "be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Id.* at 151–52 (quoting *Williams*, 288 A.2d at 353). Ultimately, however, this issue is heavily fact dependent and its resolution would require the Court to weigh evidence and make credibility determinations—improper considerations on summary judgment. *See, e.g.*, *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015) ("In considering a motion for summary judgment, the district court . . . . cannot weigh the evidence or make credibility determinations.") Accordingly, the Court will abstain from making a definitive finding at this time as to Defendant's alleged bad faith.

Finally, although Defendant is not entitled to summary judgment, the Court notes that Plaintiff's entitlement to restitution is far from a foregone conclusion. Indeed, Plaintiff is just as guilty as Defendant of taking an ostrichlike approach in his dealings with Mr. Hagen. Every accusation of bad faith Plaintiff makes against Defendant could just as easily be leveled against Plaintiff:

- According to Plaintiff, Defendant must have known of Mr. Hagen's fraud because their dealings date back to 2008. Yet, Plaintiff ignores that his own dealings with Mr. Hagen date back to 2003.

- Plaintiff points out that Defendant "never got any invoices, and never saw any paper confirming or supporting" his transactions with Mr. Hagen. (ECF No. 51, at 18.) Plaintiff, however, also never received any invoices or other documentation from Mr. Hagen verifying his purported investments.

- Plaintiff correctly observes that Defendant's "alleged 'returns,' . . . came from Mr. Hagen personally rather than from DHS or any other business venture." (*Id.* at 19.) On the other hand, Plaintiff too received "returns" in the form of monthly personal checks from Mr. Hagen for four years.

- Finally, Plaintiff notes that Defendant invested in projects with Mr. Hagen that never materialized. Yet, Plaintiff seemingly forgets that the grocery store and cell tower projects he invested in (not to mention the "fund") also never materialized.

13

Despite all the foregoing, Plaintiff continued to do business with Mr. Hagen for many years and accept money from him. Indeed, the Court is very troubled by the fact that Plaintiff received over $250,000 from Mr. Hagen over the years, money that presumably was taken from other victims of Mr. Hagen's scheme and given to Plaintiff. Thus, the Court finds itself faced with a Plaintiff and Defendant who have both seemingly benefitted at the expense of others from Mr. Hagen's fraud over the years. Thus, in spite of Defendant's apparent unjust enrichment, it very well may be inequitable for Plaintiff to recover in whole or in part due to his own unclean hands. *See, e.g.*, *Mona v. Mona Elec. Grp., Inc.*, 934 A.2d 450, 474 (Md. Ct. Spec. App. 2007) (explaining that equitable doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant" (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945))). As this case proceeds, the Court will assiduously "safeguard the judicial process" to ensure that it is not being used as a vessel "to endorse or reward inequitable conduct." *Mona*, 934 A.2d at 474 (quoting *Adams v. Manown*, 615 A.2d 611, 616 (Md. 1992)).

### IV. Conclusion

For the foregoing reasons, an Order shall enter DENYING Defendant's Motion for Summary Judgment (ECF No. 48).

DATED this 1st day of May, 2018.

BY THE COURT:

/s/
James K. Bredar
Chief Judge
